# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF ALABAMA

In re

OSCAR J. CARLTON
APRIL O. CARLTON,

    Debtors.

Case No. 08-10624-DHW
Chapter 13

## MEMORANDUM OPINION

Before the court is Wells Fargo Bank's ("Wells Fargo") objection to confirmation of the chapter 13 plan proposed by the debtors. The plan bifurcates Wells Fargo's claim into secured and unsecured components on the premise that the portion of the amount financed representing "negative equity" is not entitled to purchase money status. Upon consideration of the undisputed facts, the law, and the briefs of the parties, the court concludes that Wells Fargo's objection to confirmation should be sustained.

### Jurisdiction

The court's jurisdiction in this matter is derived from 28 U.S.C. § 1334 and from an order of the United States District Court for this district referring jurisdiction in title 11 matters to the Bankruptcy Court. *See* General Order of Reference of Bankruptcy Matters (M.D. Ala. Apr. 25, 1985). Further, because the dispute here concerns the confirmation of a plan, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) thereby extending this court's jurisdiction to the entry of a final order or judgment.

### Findings of Facts

The relevant facts are undisputed and are summarized as follows.

On February 16, 2006, the debtors purchased for their personal use a 2006 Nissan Titan from Mitchell Nissan. The purchase was financed by Wells Fargo as evidenced by a "Retail Installment Contract and Security Agreement."

As a part of the transaction, the debtors traded in a 2005 Nissan Altima.

At that time, they owed $21,194.53 on the Altima but were given a trade-in allowance of only $15,475.92. This difference left the debtors with a negative equity of $5,718.61 which was included in the amount financed.

The debtors filed the instant chapter 13 petition on April 30, 2008, less than 910 days after purchasing the vehicle. Their proposed plan bifurcates Wells Fargo's claim, cramming down the secured claim to the value of the collateral ($18,650) and treating the balance of the claim as unsecured.

## Conclusions of Law

In 2005, section 1325(a)(5) of the Bankruptcy Code was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA") to add at the end of the subsection the so-called "hanging paragraph." That portion of the statute provides:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a) (unnumbered, hanging paragraph at the end of the subsection).

Under 11 U.S.C. § 506(a)(1), a claim is secured only to the extent of the value of the collateral securing the claim. Therefore, prior to BAPCPA, in those instances where the collateral value was less than the claim, the claim was bifurcated into secured and unsecured components. This oft-used process was referred to as "cramdown." *See* 5 Keith M. Lundin, *Chapter 13 Bankruptcy* § 445-1 (3d ed. 2000 & Supp. 2007-1).

The purpose of the hanging paragraph was to prevent bifurcation of

2

certain qualifying claims. In order for the claim to qualify for anti-bifurcation protection, 1) the creditor must have a purchase money security interest in a motor vehicle, 2) the vehicle must have been acquired for the debtor's personal use, and 3) the debt must have been incurred within 910-days of the bankruptcy filing. The dispute here centers upon whether Wells Fargo has a purchase money security interest in the negative equity portion of the amount financed.

In a prior case where the same issue was considered, this court held that the negative equity portion of the amount financed did not enjoy purchase money status. *See In re Tuck*, 2007 WL 4365456 (Bankr. M.D. Ala. Dec. 10, 2007). In reaching the result, this court looked to the definition of a purchase money security interest found in *Ala. Code* § 7-9A-103 (Alabama's version of the Uniform Commercial Code (UCC)), and to Official Comment 3 to that section. The court reasoned that "[n]egative equity from a trade-in is not an expense directly related to the purchase of the second vehicle nor incidental to that purchase." *Tuck*, 2007 WL 4365456, at *3. Therefore, the court concluded that the negative equity portion of the amount financed did not enjoy purchase money status.

However, since the court's decision in *Tuck*, the Court of Appeals for the Eleventh Circuit has decided this issue in a similar case arising from the State of Georgia. *See Graupner v. Nuvell Credit Corp. (In re Graupner)*, 537 F.3d 1295 (11th Cir. 2008). There, the court held that negative equity was protected by the hanging paragraph. The court defined a purchase money security interest as:

> A security interest in collateral is "purchase money" to the extent that the item secures a debt for the money required to make the purchase. If an item of collateral secures some other type of debt, e.g., antecedent debt, it is not purchase money.

*Id.* at 1301 (quoting *In re Freeman*, 956 F.2d 252, 254-55 (11th Cir. 1992). The *Graupner* panel stated that its chore was to decide whether the negative equity constituted part of the purchase price or was merely an antecedent debt. The court acknowledged the question was a "close call." *Id.* at 1301. The court concluded that the negative equity in the amount financed was entitled to purchase money status. *Id.* at 1303.

3

In the case at bar, the debtors contend that this court is not bound by the holding in *Graupner* because it was decided, in part, under a Georgia statute to which Alabama has no counterpart. In particular, the Georgia Motor Vehicle Sales Finance Act, *Ga. Code Ann..* § 10-1-30 *et. seq.* (2000) ("MVSFA"), contains a provision wherein the phrase "cash sale price" is defined as follows:

> "Cash sale price" means the price stated in a retail installment contract for which the seller would have sold to the buyer and the buyer would have bought from the seller the motor vehicle which is the subject matter of the retail installment contract if such sale had been a sale for cash instead of a retail installment transaction. The case sale price may include any taxes; registration, certificate of title, license, and other fees; and charges for accessories and their installation and for delivery, servicing, repairing, or improving the motor vehicle. *The cash sale price may also include any amount paid to the buyer or to a third party on behalf of the buyer to satisfy a lease on or a lien on or a security interest in a motor vehicle used as a trade-in on the motor vehicle which is the subject of a retail installment transaction under this article.*

*Ga. Code Ann.* § 10-31-1(a)(1) (emphasis added). The appellate panel approved the bankruptcy court's reading of this statute *in pari materia* with *Ga. Code Ann.* § 11-9-103 (Georgia's version of the UCC) where a purchase money security interest is defined. *Id.* at 1301. That reading led the court to conclude that the negative equity was part of the purchase price and not a mere antecedent debt.

Yet, this court is convinced that the *Graupner* court would hold similarly in cases arising even under Alabama law, which has no counterpart to Georgia's MVSFA. The *in pari materia* reading of Georgia's UCC with its MVSFA merely bolstered the court's decision to accord purchase money status to the negative equity in the amount financed. More fundamentally, the court found that negative equity was equivalent to the types of expenses listed in Official Comment 3 which would not affect the purchase money character of the transaction. The court stated:

> [W]e see no persuasive reason why traditional transaction costs

4

> *and* the refinancing of reasonable, bona fide negative equity in connection with the purchase of the new vehicle should not qualify as "expenses" within the meaning of the comment. To be sure, as one court has rightly observed, the fact that "attorney's fees" are listed in Comment 3 "belies the notion that 'price' or 'value' is narrowly viewed as only those [traditional] expenses that *must* be paid to drive the car off the lot.

*Id.* at 1302 (quoting *In re Myers*, 393 B.R. 616, 620 (Bankr. S.D. Ind. 2008) (emphasis in original). The panel went on to say:

> Comment 3 further states that a purchase money security interest "requires a close nexus between the acquisition of collateral and the secured obligation." We believe there is such a "close nexus" between the negative equity in the Debtor's trade-in vehicle and the purchase of his new vehicle. The financing was part of the same transaction and may be properly regarded as a "package deal." Payment of the trade-in debt was tantamount to a prerequisite to consummating the sales transaction, and utilizing the negative equity financing was a necessary means to accomplish the purchase of the new vehicle.

*Graupner*, 537 F.3d at 1302.

Finally, the panel in *Graupner* made clear that its view of Congressional intent supported a conclusion protecting negative equity from bifurcation. The panel wrote:

> Therefore, in applying the hanging paragraph to the facts of this case, we must keep before us the underlying purpose of, and legislative intent behind, the statute. Here, the hanging paragraph ultimately seeks to require a debtor electing to retain a "910 vehicle" to pay the creditor the full amount of the claim and not (as under pre-BAPCPA law) an amount equal to the present value of the car.

*Id.* at 1302. Further, the court stated:

5

> ". . . one of BAPCPA's goals was to afford additional protection for secured creditors and, primarily, for automobile lenders." A contrary interpretation is not supported by the text of the hanging paragraph or its legislative history.

*Id.* at 1303 (quoting *In re Dunlap*, 383 B.R. 113, 118 (Bankr. E.D. Wis. 2008)).

## Conclusion

Under the authority of *Graupner*, the court finds that the inclusion of negative equity from a trade-in vehicle in the amount financed by Wells Fargo does not affect the purchase money security status its claim. Accordingly, a separate order will enter sustaining Well Fargo's objection to confirmation and prospectively dismissing the debtors' chapter 13 case if a modified plan, consonant with this memorandum opinion, is not filed within a specified time.

Done this the 24th day of November, 2008.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge

c: Debtors
  Michael D. Brock, Debtors' Attorney
  William C. Poole, Wells Fargo's Attorney
  Curtis C. Reding, Trustee